IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JILL W., individually and on behalf of her minor child, DALE W., | ) ) ) | CIVIL NO. 12-00061 SOM/KSC |
| Plaintiffs, | ) ) ) | ORDER AFFIRMING THE DECISION OF THE ADMINISTRATIVE HEARINGS OFFICER |
| vs. | ) ) | |
| STATE OF HAWAII, DEPARTMENT OF EDUCATION, and KATHRYN MATAYOSHI, in her official capacity as Acting Superintendent of the Hawaii Public Schools, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**ORDER AFFIRMING THE DECISION OF
THE ADMINISTRATIVE HEARINGS OFFICER**

I.        **INTRODUCTION.**

This court affirms the Findings of Fact, Conclusions of

Law and Decision ("Decision") issued by Haunani H. Alm, the

Administrative Hearings Officer ("AHO"), on December 30, 2011.

That decision examined whether Defendants Department of Education

for the State of Hawaii and Superintendent Kathryn Matayoshi

(collectively, the "DOE") had denied Dale W. the Free and

Appropriate Public Education ("FAPE") required by the Individuals

with Disabilities Education Act ("IDEA").[1]  The AHO correctly

determined that the DOE had not denied a FAPE.

---

[1]The Complaint in this matter misidentifies the parties as
"DALE W., individually and on behalf of her minor JILL W." See
ECF No. 1.

**II.       STATUTORY FRAMEWORK.**

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education." Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1300 (9th Cir. 1992) (citing Honig v. Doe, 484 U.S. 305, 310 (1988)). The IDEA ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

According to the IDEA, a FAPE consists of:

special education and services that-

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the school standards of the State educational agency;

(C) include an appropriate preschool, elementary school or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9). To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education and services, conduct and implement an Individualized Education Program ("IEP"), and determine an

appropriate educational placement for the student.  20 U.S.C.
§ 1414.

The student's FAPE must be "tailored to the unique
needs of the handicapped child" through an IEP.  Board of Educ.
of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 181
(1982) (citing 20 U.S.C. § 1401(18)).  The IEP, which is prepared
at a meeting between a qualified representative of the local
educational agency, the child's teacher, the child's parents or
guardian, and, when appropriate, the child, consists of a written
document containing:

> (i) A statement of the present levels of
> educational performance of the child;
>
> (ii) A statement of annual goals, including
> short-term instructional objectives;
>
> (iii) A statement of the specific educational
> services to be provided to the child, and the
> extent to which the child will be able to
> participate in regular educational programs;
>
> . . . .
>
> (v) The projected date for initiation and
> anticipated duration of these services; and
>
> (vi) Appropriate objective criteria and
> evaluation procedures and schedules for
> determining on at least an annual basis,
> whether instructional objectives are being
> achieved.

34 C.F.R. § 222.50; see also 20 U.S.C. § 1414(d).  Local or
regional educational agencies must review and, when appropriate,
revise each child's IEP at least annually.  20 U.S.C.

§ 1414(d)(4).  A school district must have an IEP in effect for
each child with a disability at the beginning of each school
year.  See 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a).
"Parental involvement is a central feature of the IDEA." Hoeft,
967 F.2d at 1300.  "Parents participate along with teachers and
school district representatives in the process of determining
what constitutes a 'free appropriate education' for each disabled
child." Id.

Violations of the IDEA may arise in two situations.
First, a school district, in creating and implementing an IEP,
may run afoul of the IDEA's procedural requirements. Rowley, 458
U.S. at 205-06.  Second, a school district may become liable for
a substantive violation of the IDEA by drafting an IEP that is
not reasonably calculated to enable the child to receive
educational benefits. Id. at 206-07.  The district must provide
the student with a FAPE that is "appropriately designed and
implemented so as to convey" to the student a "meaningful"
benefit. Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999).

While the IDEA guarantees certain procedural safeguards
for children and parents, the Ninth Circuit has recognized that
not every procedural violation results in denial of a FAPE.  See
e.g., L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 909
(9th Cir. 2009)("Procedural flaws in the IEP process do not
always amount to the denial of a FAPE.").  Procedural flaws in

the IEP process only deny a child a FAPE when the flaws affect the "substantive rights" of a parent or child. Id. Such substantive rights include the loss of a child's educational opportunity or an infringement on a parent's opportunity to participate in the IEP process. Id.

When a public school fails to provide a FAPE, and a parent establishes that placement at a private school is appropriate, the IDEA authorizes reimbursement to the parent. See 20 U.S.C. § 1412 (a)(10)(C)(ii); Sch. Comm. of Burlington v. Dep't of Ed. of Mass., 471 U.S. 359, 370 (1985). In addition, the IDEA includes a "stay put" provision that permits a child to stay in the child's current educational placement during the pendency of any administrative or judicial proceeding regarding a due process complaint notice. See 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a), (d). A plaintiff may seek a "stay put" order in the district court even if "stay put" issues were not litigated in administrative proceedings. See N.D. v. Haw. Dep't of Educ., 600 F.3d 1104, 1110-11 (9th Cir. 2010).

III.     **FACTUAL BACKGROUND.**

It is undisputed that Dale, 6 years old as of this date and autistic, is entitled to receive special education services under the IDEA. His first IEP was developed on July 8, 2010, for a pre-kindergarten program during the 2010-11 school year at a DOE public school. Dale's mother, Jill W., participated in that

5

development.  See Record on Appeal ("ROA") at 42.  Dale's IEP was
revised repeatedly.  Meetings relevant to the present appeal were
held on July 20, 2010, August 2, 2010, September 28, 2010,
November 16, 2010, December 6, 2010, April 21, 2011, May 11,
2011, and July 8, 2011.  See ROA 60, 78, 95, 114, 149, 164, 183.

        Apparently not satisfied with the results of the
meetings, Jill W., before the start of the 2011-12 school year,
enrolled Dale at the Pacific Autism Center, a private
institution.  He began there in June 2011.  Test. of Jill W.,
Transcript of Aug. 29, 2011, at 94; Test. of Christi Reed,
clinical director of the Pacific Autism Center, Transcript of
Aug. 29, 2011, at 12.

## A.    Individualized Instructional Support.

        The May 11, 2011, IEP states: "Individualized
Instructional Support (IIS) will be for entire school day at the
start of the school year (2011-2012) as part of Dale's transition
to Kindergarten.  IEP team will review and revisit service/hours
1 ½ months after start of school."  ROA at 179-80.  The AHO found
that this statement reflected the agreement of the IEP team,
including Jill W.:

> At the May 11, 2011, IEP meeting, the IEP
> Team, including Mother, determined that,
> after a month and a half into the 2011-2012
> school year, the IEP Team would meet again to
> review and reevaluate Student's needs, in
> general and with regard to his IIS services,
> to decide whether Student continued to need a
> full-time IIS service provider.  One of the

> primary goals for Student is that he learn to
> be as independent as possible and that he be
> mainstreamed into the regular education
> setting with his typically developing peers
> as much as his individual needs allow.
> Hence, the IEP Team's decision to reevaluate
> Student's need for an IIS service provider
> one and a half months into the new school
> year. Student may continue to need his IIS
> service provider or he may have gained a
> modicum of independence in the school setting
> such that this service could be scaled back
> to allow for further independence on
> Student's part. This would not be known
> until student had transitioned to
> kindergarten and spent some time in his new
> educational environment.

Decision, Findings of Fact ¶ 33, ROA at 89.

Jill W. testified before the AHO that, at the meeting of May 11, 2011, she was told, "This is going to be for the transition, and if it's going to extend longer, we'll see." Transcript of October 18, 2011, at 414.

Carrie Cacatian, Dale's special education teacher during the 2010-11 school year, testified before the AHO that the DOE never said Dale's Individualized Instructional Support services would be terminated or discontinued. Instead, she testified, the DOE "would review it as a team maybe like a month and a half after the school year started to see where Dale was at and what -- if he needed -- you know, what else he needed or if we would continue -- you know, continue with the program, if he needed -- whatever help he needed." Id. at 229-30. Any change

to such services was to be an IEP team decision made after the IEP team met again. Id. at 230.

The IEP of July 8, 2011, changed the Individualized Instructional Support, stating that it "will be for entire school day at the start of the school year (2011-2012) will continue till change by the IEP team. Speech/Language direct services for Dale will include individual and/or small group instruction. Consultation time will be in addition to the direct service minutes." See ROA 198-99.

## B.    Speech-Language Therapy.

The IEP of May 11, 2011, also provided for 1080 minutes of Speech-Language Therapy per quarter for the 2011-12 school year. See ROA at 179. This number was up from the 810 minutes per quarter listed in the IEP of April 21, 2011. See ROA at 161.

The IEPs of April 21 and May 11, 2011, identically stated: "Due to Dale's current needs, speech-language services will include but are not limited to any one or a combination of the following: 1- Individual and/or small group instruction to teach new skill(s)[;] 2- Collaboration with other individuals who will help to develop and implement strategies and activities that help reinforce use of the new skill(s) in a variety of settings." See ROA at 161 and 179; Test. of Jill W., Transcript of Aug. 29, 2011, at 91 (noting that the language did not change).

This statement was reflected in the AHO's finding: "Based on Student's success, it was time to change Student's speech therapy from primarily 1:1 individual therapy to 1:1 individual therapy in a small group therapy setting (Student, the DOE SLP [speech-language pathologist], and another child)." Decision, Finding of Fact ¶ 24, ROA 87. The AHO found:

> On May 11, 2011, the DOE SLP informed the IEP Team, including Mother, that Student's 1080 minutes per quarter of speech language therapy would be only used for 1:1 therapy. Any collaboration between the DOE SLP and Student's DOE Team members would be in *addition* to Student's 1080 minutes of 1:1 individual therapy service (emphasis added).

Id., Finding of Fact ¶ 25, ROA 87.

The AHO's finding is supported by the testimony of Kristy Kanda, a speech-language pathologist, who testified before the AHO that, despite the wording of the IEP of April 21, 2011, she told Jill W. that her services would be "direct services" and that any "collaboration" would be in addition to the direct services. Test. of Kristy Kanda, Transcript of Aug. 29. 2011 at 171-73. Nothing in the record indicates that Kanda was treating the wording of the IEP of May 11, 2011, differently. To the contrary, Jill W. testified that she understood that Dale was going to receive direct therapy for all of the minutes listed in the IEP. See Transcript of Aug. 29, 2011, at 114. She testified that, even with respect to the IEP of April 2011, she had

understood that Dale would receive all of the minutes directly.
See Transcript at 85.

The IEP of July 8, 2011, clarified: "Speech/Language
direct services for Dale will include individual and/or small
group instruction.  Consultation time will be in addition to the
direct service minutes."  ROA at 199.

### C.  Proceedings Before This court.

At the hearing on this appeal, counsel for Jill W.
argued that the IEP of May 11, 2011, did not reflect what had
been agreed to at the meeting of that date.  Counsel accused the
DOE of having deliberately created the alleged discrepancy.  He
said that he had been involved with thousands of IDEA cases over
the past 17 years and that the DOE routinely acted in an
"underhanded" manner.  He stated that the DOE does not simply
make mistakes in developing an IEP, but instead uses "tactics" to
try to take advantage of parents and students.  He explained that
he therefore advises his clients to take advantage of any
mistakes the DOE may make.  Counsel appeared to try to be
characterizing mistakes as per se violations of the IDEA
entitling a parent to unilaterally pull a child out of a public
school and seek reimbursement for private school tuition.

Challenged by the court to support his accusation, Jill
W.'s counsel denied having accused the DOE of deliberate
wrongdoing and stated that he could not prove that the DOE had

acted underhandedly in this case.  Despite his denials, counsel's statements are, of course, on the record.

This court asked Jill W.'s counsel what normally happened when there were obvious mistakes in an IEP.  The court, in the written prehearing inclinations it usually provides to the parties, had specifically asked what would happen if, for example, the IEP team agreed at a meeting that a child was to receive 1080 minutes of Speech-Language Therapy per quarter but the IEP documenting the agreement contained a typographical error providing for only "080 minutes" of such therapy.  Instead of answering the court's question about what a parent normally did, Jill W.'s counsel decided to discuss why he advised his clients in a certain way.  Counsel said that he advises his clients that a mistake constitutes a denial of a FAPE that provides clients with "opportunities."[2]

According to Jill W.'s counsel, it is his duty to advise a client to take advantage of any mistake the DOE might make.  Of course, taking advantage of a purported DOE mistake may not actually be in every client's best interest.  Not every

---

[2]Not only was Jill W.'s counsel's statement in this regard completely nonresponsive to the court's precise question, it included pointed criticism of attorneys who may have counseled a different approach.  Jill W.'s counsel specifically named "Carl" and "Stan" and "Jerel Fonseca."  In a district of this district's size, this judge has a good idea of who "Carl" and "Stan" are.  The court was astonished that Jill W.'s counsel so freely denigrated well-respected attorneys having nothing to do with this case.

mistake results in the denial of a FAPE such that the DOE will be required to reimburse a parent for private school tuition.  A parent who unilaterally enrolls a child in a private school may end up being liable for the private school tuition.[3]

Jill W. makes three arguments in this appeal.  First, she argues that the IEP of May 11, 2011, denied Dale W. a FAPE because its memorialization of Dale W.'s Individualized Instructional Support differed from what the IEP team had agreed to.  Second, she argues that the same IEP failed to reflect the IEP team decision concerning speech-language services that were to be provided to Dale W.  Finally, she argues that this matter should be remanded to the AHO for a determination of the remedy for the alleged denials of a FAPE.  Unpersuaded by these arguments, the court affirms the Decision.

IV.      STANDARD OF REVIEW.

Any party aggrieved by a decision of a due process hearings officer under the IDEA may appeal the findings and decision to any state court or a United States district court. 20 U.S.C. § 1415(i)(2).  The party challenging the administrative decision has the burden of proving deficiencies in the administrative decision.  <u>Seattle Sch. Dist., No. 1 v. B.S.</u>, 82 F.3d 1493, 1498 (9th Cir. 1996).

---

[3]Jill W.'s counsels's advice in the present case reminds this court of <u>A.R. v. Hawaii</u>, Civ. No. 10-00174 SOM/RLP, an IDEA case in which Jill W.'s counsel also represented the plaintiffs.

When evaluating an appeal of an administrative decision, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

Under the IDEA, district courts review the hearings officer's conclusions de novo.  Ashland Sch. Dist. v. Parents of Student E.H., 587 F.3d 1175, 1182 (9th Cir. 2009).  However, de novo under the IDEA "carries with it the implied requirement that due weight shall be given to [the administrative] proceedings." Id. (quoting Rowley, 458 U.S. at 206).  A district court "must give deference to the state hearing officer's findings, . . . and avoid substituting its own notions of sound educational policy for those of the school authorities which it reviews." Id. (internal quotation marks, modifications, and citations omitted).  A court must consider the findings carefully and respond to the hearings officer's resolution of each material issue.  Capistrano Unified Sch. Dist. v. Warternberg, 59 F.3d 884, 891 (9th Cir. 1995).  The court, however, is free to accept the findings in part or in whole.  Id.  Greater deference is appropriate when the findings are "thorough and careful." JG v. Douglas County Sch. Dist., 552 F.3d 786, 793 (9th Cir. 2008). The Third Circuit has stated that "special weight" is due when

the hearings officer has heard live testimony and "found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness," and "a District Court must accept the state agency's credibility determinations unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion." L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 n.4 (3d Cir. 2006) (citations omitted).

## V.        ANALYSIS.

On June 8, 2011, Jill W. filed a request for an impartial due process hearing with the Office of Administrative Hearings of the Department of Commerce and Consumer Affairs. See ROA at 1. Jill W. argued that the Extended School Year services were defective because they included a 19-day break in instruction, which Jill W. said was too long. Id. at 3. She also argued that, with respect to Individualized Instructional Support, the IEP of May 2011, was defective because it failed to provide for such services for the entire school year and would instead terminate after the school year started. Id. at 4. Finally, Jill W. argued that, with respect to Speech-Language Therapy, the IEP of May 11, 2011, was deficient because it did not state clearly whether the 1080 minutes per quarter were on a one-to-one basis or how much of that therapy would be in collaboration with others. Id. at 3-4.

On December 30, 2011, the AHO issued her Decision, concluding that the DOE had offered Dale a FAPE. <u>See</u> ROA at 79.

Jill W. appealed to this court, arguing that the Decision should be reversed because the IEP "was not appropriate for the reasons so stated in the original hearing complaint." <u>See</u> Complaint ¶ 11, Jan. 27, 2012, ECF No. 1.

On June 29, 2012, Jill W. filed her Opening Brief. <u>See</u> ECF No. 20. The Opening Brief makes three arguments: 1) the IEP of May 11, 2011, denied Dale a FAPE because it did not reflect the agreement of the IEP team with respect to Individualized Instructional Support; 2) the IEP of May 11, 2011, denied Dale a FAPE because it was not clear with respect to how many minutes of his Speech-Language Therapy would be one-to-one and therefore did not reflect the IEP team's agreement; and 3) the AHO erred in not providing a remedy for the denial of a FAPE. To the extent Jill W. had raised any other argument at the administrative hearing, including but not limited to whether the 19-day break was too long, she concedes that any such argument is waived for purposes of the present appeal.

### A. Individualized Instructional Support.

The IEP of May 11, 2011, provided: "Individualized Instructional Support (IIS) will be for entire school day at the start of the school year (2011-2012) as part of Dale's transition to Kindergarten. IEP team will review and revisit service/hours

15

1 ½ months after start of school." ROA at 179-80. The AHO found that this accurately reflected the agreement of the IEP team, including Jill W. See Decision, Findings of Fact ¶ 33, ROA at 89. The statement in the IEP of May 11, 2011, was identical to the one in the IEP of April 21, 2011. Jill W. testified that she understood that the minutes stated would be provided directly, and that any "collaboration" would be in addition to the minutes stated. Transcript at 85 and 114.

In seeking reversal of the AHO's Decision, Jill W. argues that the IEP of May 11, 2011, did not reflect the agreement of the IEP team with respect to IIS. She contends that the IEP team had agreed to provide IIS services for the whole year, not just for 1 ½ months. See Opening Brief at 4, ECF No. 20. But nothing in the IEP says that IIS services would be limited to 1 ½ months. Carrie Cacatian, Dale's special education teacher during the 2010-11 school year, testified before the AHO that the DOE never said Dale's IIS services would be terminated or discontinued. Instead, she testified, the team planned to review IIS "maybe like a month and a half after the school year started to see where Dale was at and what -- if he needed -- you know, what else he needed or if we would continue -- you know, continue with the program, if he needed -- whatever help he needed." Id. at 229-30. Thus, any change to IIS would have been

an IEP team decision made after the IEP team met again.  Id. at 230.

Jill W. also testified before the AHO that, at the meeting of May 11, 2011, she was told, "This is going to be for the transition, and if it's going to extend longer, we'll see." Transcript of October 18, 2011, at 414.  As the AHO found, the IEP reflected the agreement as to what IIS would be provided to Dale.

The court is unpersuaded by Jill W.'s citation to the testimony of Jennifer Garvey, the school district's Autism Consulting Teacher.  Jill W. says that Garvey testified that Garvey would suggest a one-to-one aide to implement Student's program at all times.  See Opening Brief at 4 (citing Transcript at 400).  However, the transcript page Jill W. cites in this regard merely says, "Q: In order to implement that program, would you need a paraprofessional or a one-on-one aide?  A: It would help.  It's not necessary, but I would suggest it, yes." Contrary to what Jill W. says Garvey testified to, Garvey's testimony supports the AHO's finding.  Garvey testified that the IEP team was planning to reconvene 1 ½ months into the school year to see what was working and what was not.  Garvey testified that the IEP team was going to revisit and discuss IIS after Dale had attended kindergarten for a short time, not that the IIS was

going to be terminated 1 ½ months after the school year started. See Transcript at 381-82.

Jill W. also argued at the hearing before this court that, quite apart from Garvey's testimony, the plain language of the IEP of May 11, 2011, indicated that IIS would be terminated after 1 ½ months. That provision was not, as Jill W. claims, a "twilight clause," as the services were not scheduled to terminate after a certain period of time. To the contrary, the IEP of May 11, 2011, states: "Individualized Instructional Support (IIS) will be for entire school day at the start of the school year (2011-2012) as part of Dale's transition to Kindergarten. IEP team will review and revisit service/hours 1 ½ months after start of school." ROA at 179-80. As the AHO found based on the evidence before her, the IEP team intended to meet again to see how Dale's transition to kindergarten was going. If it was going well, IIS might be scaled back. Then again, Dale might have continued to need a one-to-one aide for the entire school day. His needs would not be known until he had spent some time in the kindergarten setting. See Decision, Findings of Fact ¶ 33, ROA at 89.

Jill W. fails to meet her burden on this appeal of showing that the AHO erred in finding that the IEP of May 11, 2011, accurately reflected what the IEP team had decided with respect to IIS.

18

### B.    Speech-Language Therapy.

Jill W. argues that she could not tell from the IEP of
May 11, 2011, whether the 1080 minutes of Speech-Language Therapy
would be entirely on a one-to-one basis.  Because the IEP stated
that Speech-Language Therapy would include but not be limited to
"one or a combination of" individual or small group instruction,
ROA at 179, Jill W. argues that the IEP did not accurately
reflect the IEP team's agreement.  See Opening Brief at 11.  The
problem with Jill W.'s argument is that the same language
concerning Speech-Language Therapy was contained in both the
April 21, 2011, and the May 11, 2011, IEPs.  Jill W. apparently
agreed to the April language.  The AHO found that that language
had been the subject of discussion at the IEP team meeting of May
11, 2011:

> On May 11, 2011, the DOE SLP informed the IEP
> Team, including Mother, that Student's 1080
> minutes per quarter of speech language
> therapy would be only used for 1:1 therapy.
> Any collaboration between the DOE SLP and
> Student's DOE Team members would be in
> *addition* to Student's 1080 minutes of 1:1
> individual therapy service (emphasis added).

Id., Finding of Fact ¶ 25, ROA 87.

The AHO's finding is supported by the testimony of
Kristy Kanda, a speech-language pathologist, who testified that
she told Jill W. that her services would be "direct services" and
that any "collaboration" would be in addition to the direct
services.  Test. of Kristy Kanda, Transcript of Aug. 29. 2011 at

171-73.  Nothing in the record indicates that Speech-Language
Therapy was to be treated differently under the IEP of May 11,
2011.  Even Jill W. testified that she understood that Dale was
to receive direct therapy for all of the minutes listed in the
IEP.  See Transcript of Aug. 29, 2011, at 85 and 114.

Even if the IEP of May 11, 2011, did not reflect that
all 1080 minutes per quarter would be direct therapy and that any
"collaboration" would be in addition to that direct therapy, no
denial of a FAPE occurred.  Jill W. is asserting a procedural
violation of the IDEA.  However, not every procedural violation
results in the denial of a FAPE.  See e.g., L.M. v. Capistrano
Unified Sch. Dist., 556 F.3d at 909.  Procedural flaws in the IEP
process only deny a child a FAPE when the flaws affect the
"substantive rights" of a parent or child.  Id.  Such substantive
rights include the loss of a child's educational opportunity or
an infringement on a parent's opportunity to participate in the
IEP process.  Id.  Even assuming the IEP of May 11, 2011, was
not clear as to whether the Speech-Language Therapy minutes were
to be entirely one-to-one, as indicated to Jill W. at the IEP
team meeting, Dale did not lose out on any education opportunity.
Nor did Jill W. lose an opportunity to participate in the IEP
process.  As Kristy Kanda testified and Jill W. understood, the
DOE intended to provide the listed minutes entirely on a direct,
one-to-one basis.  Moreover, any ambiguity was addressed before

the start of the school year, when another IEP dated July 8, 2011, clarified that "Speech/Language direct services for Dale will include individual and/or small group instruction. Consultation time will be in addition to the direct service minutes."  ROA at 199.

Jill W. does not demonstrate a denial of a FAPE with respect to speech-language therapy.

### C.    Remedy.

The DOE and respected attorneys were not the only ones disparaged by Jill W.'s counsel in the hearing before this court. Counsel asked this court to remand this case to the AHO, who, counsel said, so thoroughly distrusts Jill W. that the AHO would, of course, render what counsel said in a sarcastic tone would be a fair decision.  Asked to repeat what he said, counsel then stated, without the attitude, that this matter should be remanded to the AHO for a determination of the proper remedy for the alleged denials of a FAPE because the AHO is familiar with the witnesses and autistic children, and specializes in IDEA law such that she could make an equitable determination.  Having failed to demonstrate any denial of a FAPE, Jill W. demonstrates no error in the AHO's refusal to provide a remedy.

## VI. CONCLUSION.

The Decision of the AHO is AFFIRMED. The Clerk of Court is directed to enter judgment for Defendants and to close this case. The attorneys in this case are ordered to ensure that their respective clients receive copies of this order.

IT IS SO ORDERED.

DATED: Honolulu, September 25, 2012.



/s/ Susan Oki Mollway

Susan Oki Mollway
Chief United States District
Judge

Jill W., et al. v. State of Hawaii, Department of Educ., et al., Civ. No. 12-00061 SOM/KSC; ORDER AFFIRMING THE DECISION OF THE ADMINISTRATIVE HEARINGS OFFICER